# NO. 12-11-00319-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 420TH* |
| *J. M. AND Z. M.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN,* | § | *NACOGDOCHES COUNTY, TEXAS* |

---

## *MEMORANDUM OPINION*

K.S. appeals the termination of her parental rights. In four issues, K.S. challenges the order of termination. We affirm.

## BACKGROUND

K.S. is the mother of two children, J.M., born January 27, 2006, and Z.M., born January 14, 2010. J.D.M.[1] is the father of J.M., and C.M., aka C.S.,[2] is the father of Z.M. Neither father is a party to this appeal.

Approximately two months after Z.M. was born, the Department of Family and Protective Services (the Department) filed an original petition for protection of J.M. and Z.M., for conservatorship, and for termination of K.S.'s parental rights. The Department was

---

[1] On May 14, 2010, J.D.M. signed an unrevoked or irrevocable affidavit of voluntary relinquishment of parental rights to the Texas Department of Family and Protective Services. Accordingly, on October 5, 2011, the trial court ordered the termination of his parent-child relationship with J.M.

[2] On October 5, 2011, the trial court found that C.M., aka C.S., had engaged in one or more of the acts or omissions necessary to support termination of his parental rights pursuant to Section 161.001(1) of the Texas Family Code. However, the trial court determined that termination of the parent-child relationship between Z.M. and C.M., aka C.S., was not in the child's best interest. Based on these findings, the trial court ordered that the parent-child relationship between Z.M. and C.M., aka C.S., not be terminated. Therefore, the trial court ordered that the Department be appointed managing conservator of Z.M. and that C.M., aka C.S., be appointed possessory conservator of Z.M.

appointed temporary managing conservator of the children, and K.S. was appointed temporary possessory conservator.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that K.S. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights pursuant to Section 161.001(1) of the Texas Family Code, subsections (D), (E), (F), and (O), or more specifically, had

> knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endanger[ed] the physical or emotional well being of the children;
>
> engaged in conduct or knowingly placed the children with persons who engaged in conduct that endanger[ed] the physical or emotional well being of the children;
>
> failed to support the children in accordance with the mother's ability during a period of one year ending within six months of the date of the filing of the petition; or
>
> failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children.

The trial court also determined that termination of the parent-child relationship between J.M., Z.M., and K.S. was in the children's best interest. Based on these findings, the trial court ordered that the parent-child relationship between J.M., Z.M., and K.S. be terminated. This appeal followed.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In her first issue, K.S. argues that the trial court erred because it did not prepare findings of fact and conclusions of law. At K.S.'s request, we abated the appeal and ordered that the trial court prepare and file findings of fact and conclusions of law. Because the trial court did so, K.S.'s first issue is moot.

### ADMISSION OF EVIDENCE

In her second issue, K.S. contends that the trial court erred by admitting two exhibits offered by the Department over her objections.

**Standard of Review**

We review a trial court's evidentiary rulings for abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or if its actions are arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp.*, 972 S.W.2d at 43.

**Governing Law**

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004). Records of regularly conducted activity (business records) fall within such an exception, and their admission may be established "by [an] affidavit that complies with Rule 902(10)." TEX. R. EVID. 803(6).

To obtain reversal of a judgment based on a trial court's error in admitting or excluding evidence, the complaining party must show that (1) the trial court committed an error, and (2) the error was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *State v. Cent. Expressway Sign Assoc.*, 302 S.W.3d 866, 870 (Tex. 2009); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *see also* TEX. R. APP. P. 44.1(a)(1). In making this determination, the court must review the entire record. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. The general rule is that error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *Ramirez*, 159 S.W.3d at 907. Moreover, the exclusion is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. A successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001).

**Application**

The Department offered two exhibits during the testimony of Charlene Reed, a Department case worker. Both exhibits were one page certified copies of drug tests results for K.S. from the Texas Alcohol and Drug Testing Service. Exhibit 3 showed that K.S.'s April 14, 2010 urinalysis was positive for marijuana. Exhibit 4 showed that K.S.'s April 20, 2010 hair follicle test result was positive for cocaine. K.S. objected, stating that the exhibits were not self-authenticating public records and that Reed did not lay the proper foundation to admit the exhibits as business or certified records. K.S. also objected that the records were hearsay. The trial court overruled K.S.'s objections and admitted Exhibits 3 and 4 into evidence. Reed then testified about the contents of the exhibits.

These exhibits do not include an affidavit that complies with Rule 902(10). *See* TEX. R. EVID. 803(6). The Department argues that any error in admitting the exhibits containing the drug test results was harmless because the same or similar evidence was subsequently introduced without objection. *See Ramirez*, 159 S.W.3d at 907. We agree.

In addition to her testimony about the drug test results, Reed stated that K.S. tested positive for cocaine in January 2011. She testified further that Exhibit 5, which was admitted into evidence without objection, showed that K.S.'s January 11, 2011 hair follicle test was positive for cocaine. Two Department investigators also testified regarding K.S.'s positive drug test results. According to the first investigator, K.S. admitted that she smoked marijuana before giving birth to Z.M., but denied using cocaine. The first investigator also reviewed records from the Nacogdoches Memorial Hospital, and stated that those records showed K.S. tested positive for marijuana in three prenatal drug tests. The hospital records, which were admitted into evidence without objection, also showed that Z.M. tested positive for marijuana and cocaine at birth. The second investigator testified that on February 22, 2010, K.S. tested positive for cocaine. The investigator's affidavit in support of the original petition for protection of a child showed that K.S. tested positive for cocaine in February 2010. K.S. did not object to any of this evidence regarding her positive drug test results.

Because evidence that K.S. tested positive numerous times for marijuana and cocaine was admitted prior to, and after, the complained of rulings without objection, we agree that any error in admitting Exhibits 3 and 4 was harmless. *See id*. Accordingly, we overrule K.S.'s second issue.

4

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2012); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). The burden of proof is upon the person seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most

favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

The trial court's findings of fact and conclusions of law have the same force and dignity as a jury's verdict upon jury questions. *See Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003) (per curiam) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). We review the trial court's findings of fact for legal and factual sufficiency of the evidence under the same standards as applied to jury findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The trial court's conclusions of law are not reviewable from an evidentiary standpoint; however, we may review the conclusions drawn from the facts to determine their correctness. *See In re Marriage of Harrison*, 310 S.W.3d 209, 212 (Tex. App.—Amarillo 2010, pet. denied) (citing *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.—Dallas 1997, writ denied) (en banc)).

## TERMINATION UNDER SECTION 161.001(1)(E)

As part of her third and fourth issues, K.S. argues that the evidence is legally and factually insufficient to support a finding that she engaged in conduct, or knowingly placed the children with persons who engaged in conduct, that endangered their physical or emotional well being.

## Applicable Law

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well being of the child. TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012). The specific danger to the child's well being need not be established as an independent proposition, but may instead be inferred from parental misconduct. *Tex. Dep't of Human Svcs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.J.*, 911 S.W.2d at 440. Scienter is not required for an appellant's own acts under Section 161.001(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re N.K.*, 99 S.W.3d 295, 301 n.9 (Tex. App.—Texarkana 2003, no pet.); *In re M.D.S.*, 1 S.W.3d at 200.

"Endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re D.M.*, 58 S.W.3d 801, 811 (Tex. App.—Fort Worth 2001, no pet.). It is not necessary that the conduct be directed at the child or that the child actually suffers injury; rather, it is sufficient that the child's well being be jeopardized or exposed to loss or injury. *Boyd*, 727 S.W.2d at 533; *In re J.J.*, 911 S.W.2d at 440. Subsection (E) requires us to look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. *In re D.J.*, 100 S.W.3d 658, 662 (Tex. App.—Dallas 2003, pet. denied); *In re D.M.*, 58 S.W.3d at 811. It is inconsequential that the parental conduct occurred before the child's birth. *In re U.P.*, 105 S.W.3d at 229; *In re D.M.*, 58 S.W.3d at 812. Instead, courts look to what the parent did both before and after the child's birth to determine whether termination is necessary. *In re D.M.*, 58 S.W.3d at 812. Termination under subsection (E) must be based on more than a single act or omission. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d 625, 634 (Tex. App.—Fort Worth 2000, pet. denied). A voluntary, deliberate, and conscious "course of conduct" by the parent that endangers the child's physical and emotional well being is required. *In re D.M.*, 58 S.W.3d at 812; *In re D.T.*, 34 S.W.3d at 634.

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well being of a child. *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort

Worth 2004, pet. denied). A factfinder may reasonably infer from a parent's repeated failure to attend scheduled drug screenings that the parent was avoiding testing because the parent was using drugs. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's repeated engagement in illegal drug activity after agreeing not to do so in a service plan for reunification with her children may be considered in an analysis of whether clear and convincing proof exists of voluntary, deliberate, and conscious conduct that endangered the well being of her children. *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.). A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well being. *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

**Analysis**

The evidence at trial showed the Department began investigating K.S., J.M., and Z.M. in January 2010 because of allegations from the Nacogdoches Memorial Hospital that K.S. and Z.M. tested positive for marijuana and cocaine when Z.M. was born. K.S.'s medical records revealed that K.S. tested positive for marijuana three times in August and September of 2009 while she was pregnant with Z.M. K.S. admitted to a Department investigator that she smoked marijuana the day before giving birth to Z.M., but denied using cocaine. However, she told the investigator that the marijuana cigarette tasted "funny," and she believed that is where the cocaine came from. K.S. agreed to live with a friend, L.S., and have L.S. supervise contact with her children.

After K.S. left the hospital, she requested that she be allowed to leave L.S.'s home and have someone else supervise contact with her children. K.S. also agreed to random drug testing. Another Department investigator stated that K.S. left for Tyler, Texas, with the children without informing anyone at the Department. Department employees were unable to contact K.S. for approximately twenty days and discovered she was in Tyler when she called the Department's investigator. K.S. initially refused to submit to a drug test because she was in Tyler, but eventually agreed to do so. In February 2010, K.S. tested positive for cocaine, but she denied any drug use. Because K.S. had a second positive drug test, the Department informed her that she would have to participate in family based safety services. Although K.S. agreed to comply,

8

she never made an appointment to meet with the Department's workers so those services were not initiated.

The Department decided to remove the children because K.S. was not cooperating. When Department workers and law enforcement went to K.S.'s house on March 10, 2010, no one answered the door even though they could hear people moving around inside the house. Eventually, law enforcement gained entry and discovered K.S., K.S.'s sister, and the children inside the house. According to one Department worker, K.S. was very hostile and aggressive on the day of removal, and the confrontation between the workers, law enforcement, K.S., K.S.'s sister, and the children continued to escalate. K.S. told the Department that C.M. was Z.M.'s father. One of the Department's investigators met C.M. at jail. C.M. said he was glad the Department removed the children because K.S. and her family used drugs, and that the children were around drugs when they were with K.S.

K.S. was provided a handwritten copy of the family plan of service, which included requirements that she submit to random drug testing, pay child support, obtain housing and employment, and participate in a psychological evaluation, parenting classes, and counseling. K.S. tested positive for marijuana on April 14, 2010; positive for cocaine on April 20, 2010; and positive for cocaine on January 21, 2011. However, K.S.'s drug tests in January, April, June, and July 2011 were negative. K.S. was also requested to submit to drug testing twice in May 2010, but she failed to do so. K.S.'s case worker stated that if a parent fails to submit to drug testing when asked, the Department considers it to be a positive drug test. K.S. was also ordered to submit to drug testing in August 2010, February 2011, and July 2011. However, she did not submit to drug testing in August 2010 or February 2011, and did not offer any explanation for her failure to do so.

K.S. had visitation with her children in April 2010, but then tested positive for drugs. K.S.'s case worker testified that it was the Department's policy not to allow visitation when a parent has a positive drug test. K.S. did not participate in visitation with her children from April 2010 through May 2011 because of her failure to submit to drug testing or because of positive drug test results.

K.S. testified that in January 2010, she was hanging around the wrong people and had a different lifestyle that involved smoking marijuana. She testified that J.M. lived with her while she was pregnant with Z.M. and using drugs, including marijuana. She said, however, that her

9

children were never around when she was using drugs. K.S. also testified that her children, her situation, and getting her priorities "together" made her stop smoking marijuana. She stated that it took her more than a year to come to this realization because she had to do rehabilitation on her own even though she requested services. K.S. stated that in order to stop using drugs, she took parenting classes and went to counseling.

K.S. testified that she last used marijuana before November 2010. She also stated that she failed to "show up" at random drug testing because her aunt was sick, meaning that she had to travel back and forth from Nacogdoches to Tyler. K.S. testified that she became pregnant with her third child around January 17, 2011, and admitted that she tested positive for drugs, "maybe cocaine," about January 21, 2011. She said that she failed to submit to court ordered drug testing in February 2011 because she missed the bus to the medical center.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, the trial court could have determined that K.S. had numerous positive drug tests for both marijuana and cocaine, that she admitted drug use before Z.M.'s birth, that Z.M. tested positive for marijuana and cocaine after birth, that she continually failed to submit to court ordered or random drug testing, that she was unable to visit her children from April 2010 through May 2011 because of her failure to submit to drug testing or because of positive drug test results, and that this unstable home life subjected the children to a life of uncertainty and instability. *See In re M.R.J.M.*, 280 S.W.3d at 503; *In re M.E.-M.N.*, 342 S.W.3d at 263.

Although there is evidence that conflicts with the trial court's findings, including K.S.'s negative drug test results in January, April, June, and July 2011, the trial court could have resolved this conflict in favor of its finding. This evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that K.S. engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well being.

Therefore, we hold that the evidence is legally and factually sufficient to support termination of K.S.'s parental rights under Section 161.001(1)(E). Accordingly, we overrule that portion of K.S.'s third and fourth issues regarding Section 161.001(1)(E).[3]

---

[3] Under Section 161.001, the Department was required to prove only one ground of termination under subsection (1). Because we have concluded that the evidence is legally and factually sufficient to support

Also as part of her third and fourth issues, K.S. argues that the evidence is legally and factually insufficient to support a finding that termination of her parental rights is in the best interest of the children. In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id.* However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d at 814. The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

**Analysis**

As noted above, K.S. tested positive for marijuana while she was pregnant with Z.M., and K.S. and Z.M. tested positive for marijuana and cocaine in the hospital when Z.M. was born. Further, K.S. admitted smoking marijuana the day before Z.M. was born. The record shows that K.S. continually failed to submit to court ordered and random drug testing, and tested positive for cocaine or marijuana on three separate occasions after Z.M. was born.

An investigator with the Department stated that when she and law enforcement arrived at K.S.'s house to remove the children, she attempted to remove J.M. for his safety because the atmosphere during the removal was very hostile and aggressive. K.S. told J.M. not to leave and appeared to be encouraging him to "get in with" the arguing and fighting. K.S. admitted being upset about her children being removed, but denied being hostile. Both children were taken to a foster home. Shortly after the children were removed, however, the director of the daycare

---

termination of K.S.'s parental rights under subsection (1)(E), we need not determine if the trial court's findings under subsections (1)(D), (1)(F), and (1)(O) are also supported by legally and factually sufficient evidence. Therefore, we do not address K.S.'s third and fourth issues regarding subsections (1)(D), (1)(F), or (1)(O).

informed the Department that J.M. would no longer be allowed there even though it was only J.M.'s first day at daycare. J.M.'s behavior was uncontrollable, and he was "a harm" to himself, to the other children, and to the staff. J.M. also had to be removed from his first foster home because of his behavior, i.e., cursing, fighting, biting, screaming, hitting, and punching until he had to be restrained.

The Department requested that J.M. receive counseling and therapy at a children's home. During his transportation to the children's home, J.M. was physically restrained in the vehicle. However, he got away from the Department worker seated beside J.M., attempted to open the door, tried to break a radio and air conditioning unit in the back seat by kicking it repeatedly, tried to pull down a lever to the back window to kick it out, and used foul language. A Department investigator, who was driving the vehicle, stated that she had to pull over twice and restrain him until he "literally wore himself out," screaming and crying. At this time, J.M. was three years old. The investigator testified that she did not consider this to be normal behavior for a three year old child, and stated that his behavior was constant and repeated itself. When the investigator tried to talk to K.S. about J.M.'s behavior, K.S. said that J.M. was upset, that he wanted to be with her, "what do you expect," and showed no indication that J.M.'s behavior was anything unusual. K.S. stated that she did not believe this behavior occurred because he had never cursed around her or had temper tantrums.

After the children's removal, the Department set up visitations between K.S. and the children. During the first visit, K.S. and her sister made several comments to the Department investigator through the one-way observation room and encouraged J.M.'s unacceptable behavior, including kicking, screaming, and "being bad." The investigator testified that at one point, K.S. called her "the white devil" through the observation glass. K.S. denied encouraging J.M.'s bad behavior during this visit or calling the investigator a "white devil." K.S. was unable to visit her children from April 2010 through May 2011 because of her failure to submit to drug testing or positive drug test results.

According to K.S., she believed it was in her children's best interest to be with her because she was their mother. K.S. stated that her future plans included getting her children home and continuing her education. She said that she was enrolled online for courses in healthcare administration, and should be able to find work in a hospital. K.S. planned to live with C.M. and for them to raise their family. She admitted at trial that she was eight and one-

half months pregnant with C.M.'s baby, a boy. K.S. also admitted that she tested positive for cocaine shortly before, or after, she became pregnant with this child. She stated that she and C.M. reunited during their visitations with Z.M., and talked about needing to be a family and raise their children together.

K.S. was aware that one of the conditions of her service plan was to refrain from associating with persons who engaged in illegal drug use or criminal activities. She admitted that C.M. had an extensive criminal history, including illegal drug use, but characterized it as "past history." She believed her contact with him was appropriate because they had children together. She admitted that C.M. was in jail in January 2010 when Z.M. was born, having been arrested for burglary of a habitation two days earlier. She also acknowledged that C.M. went to prison for possession with intent to deliver cocaine. C.M.'s criminal record also included possession of marijuana, misdemeanor assault, and forgery. At trial, C.M. admitted that he "used to be" a drug user and addict, but denied that he had used drugs after November 2009. He tested positive for cocaine on February 14, 2011, but his drug tests in April, June, and July 2011 were negative.

K.S. testified that at the time of trial, she lived in a Section 8 housing assistance duplex. Although the Department investigator testified that K.S.'s housing assistance was in "termination status" as of April 2011, K.S. denied being told that she was about to be evicted. K.S. admitted that she was not working because she was pregnant, but had worked at three part-time jobs since February 2011. She did not have a vehicle, but used the bus, neighbors, or C.M. for transportation. According to the Attorney General's office, K.S. had paid only $472.96 in child support since May 2010, and owed approximately $4,000.00.

At the time of trial, J.M. was five years old and Z.M. was nineteen months old. The CASA representative and guardian ad litem for the children testified that she was appointed to their case in March 2010. The guardian ad litem stated that she visited J.M.'s school the week before trial and observed him with his teacher. She testified that J.M. interacted well and was very respectful. When J.M. was asked who his parents were, he responded that "Mrs. Tommie is my mom," and when asked who his dad was, he said, "George. He's my dad." The guardian ad litem testified that J.M. was "just bubbling over," thriving, and more at ease, "like he's safe." She said that Z.M. followed his foster father around and appeared to be overwhelmed to be with the foster parents. She recommended that K.S.'s parental rights be terminated.

**Conclusion**

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that J.M. was uncontrollable and exhibited bad behavior after being removed, that the children were happy and thriving at the time of trial, that K.S. tested positive for marijuana and cocaine while she was pregnant with her children and during the pendency of this case, and that K.S. was unable to visit her children for over one year because she refused to submit to drug testing or tested positive for drugs. Further, the trial court could have concluded that K.S. wanted her children to live with C.M., Z.M.'s father, even though he had an extensive criminal and illegal drug history. After considering all the evidence in relation to the best interest factors in the light most favorable to the court's finding and applying the *Holley* factors, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination of K.S.'s parental rights was in the best interest of the children.

K.S. contended that J.M.'s bad behavior was not the result of her parenting as the Department contended, but was because he had been removed from her care and wanted to remain with her. She also argued that she could not submit to random drug testing on several occasions because she was in Tyler with a sick relative, and not because she had been using drugs. However, this disputed evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating K.S.'s parental rights was in the best interest of the children.

Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of K.S.'s parental rights is in the best interest of the children. Accordingly, we overrule that portion of K.S.'s third and fourth issues regarding the best interest of the children.

**DISPOSITION**

We have concluded that K.S.'s first issue is moot. We have also overruled K.S.'s three remaining issues. Accordingly, we *affirm* the judgment of the trial court.

JAMES T. WORTHEN
Chief Justice

Opinion delivered October 16, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*
(PUBLISH)

14



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### OCTOBER 16, 2013

### NO. 12-11-00319-CV

### IN THE INTEREST OF J. M. AND Z. M., CHILDREN,

Appeal from the 420th District Court
of Nacogdoches County, Texas (Tr.Ct.No. C1026137)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice..
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*